IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| WILLIAM ALTON | * | |
| Plaintiff | * | |
| v | * | Civil Action No. WMN-12-1164 |
| WARDEN, et al. | * | |
| Defendants | * | |

***

# MEMORANDUM

Pending is Defendants' Motion to Dismiss or for Summary Judgment. ECF No. 19. Plaintiff opposes the motion. ECF No. 26. The Court finds (1) a hearing in this matter is unnecessary, Local Rule 105.6, and (2) the motion will be granted.

## Background

Plaintiff William Alton ("Alton") alleges that on April 18, 2011, he was transported to Bon Secours hospital for a colonoscopy. He claims Officers Neville Johnson and Anthony Smith refused to honor numerous written medical orders not to cuff or shackle Plaintiff while he was using crutches. Smith allegedly argued with the nurse about how Alton should be transported and Alton explained to Captain Woods how he is normally transported, showing him relevant medical orders. Alton claims Woods refused to modify Alton's restraints as he requested because Security Chief Allen Gang as well as a Major had advised Smith to use his judgment. Smith then told Alton he could not keep his crutches with him while at Bon Secours even though Alton explained he needed them to get to the toilet and to move around. Lt. Apera Bell told Alton he would not need crutches because the medical staff at Bon Secours would be responsible for moving him. Alton alleges he was also told he had to use a wheelchair despite his protest that use of a wheelchair would be painful for him.

Upon arriving at Bon Secours, Alton asked to use the toilet, but his request was denied by Johnson and Smith, who ordered Alton to use a bedpan instead. Alton alleges that the bedpan was physically impossible for him to use. Alton claims that Nurses Mary, Terry, Rose and Louise tried to help him use the bedpan, but he could not sit on it without a lot of pain and could not balance on it. He complained to the nurses about the officers' denial of his requests to use the toilet and three of the nurses confronted the officers on his behalf. Alton states that the officers, when confronted, responded with requests for something to eat and "don't worry about him." He claims that Officer Frederick Taylor replied, "fuck him, if he does not like the way he's being treated, he should stay out of prison."

Alton states he underwent a colonoscopy, followed by gallbladder removal and hernia repair surgeries which required four drains to be surgically implanted in his abdomen. He claims "[t]he need for these surgeries alone show that defendants acted recklessly with disregard to a substantial risk of danger or serious harm." Following surgery, Alton states he could not sit upright, turn over, move his legs without the use of his arms, eat, lie on his stomach or use the bed pan without causing himself severe pain. He claims being handcuffed and shackled to the bed made the pain and inconvenience worse.

Alton claims that on or about April 19, 2011, a blood clotting prevention device was placed on his left leg. He told nursing staff, Barbara, Anne, Terry and a black male nurse that every few minutes, when the device inflated, it caused the shackle to press into his ankle, resulting in severe bruising, abrasions and pain every one to two minutes. Alton alleges the problem was brought to the attention of Smith, and Officers Dower and West, as well as members of the nursing staff, but they refused to switch the shackle from one ankle to the other.

Alton's request to have the shackle moved to the other leg was, however, granted by officers on the next shift.

Alton states he was moved to a secure ward, but was still kept in restraints. On April 21, 2011, Smith removed Alton's handcuffs so Alton could eat, but Officer West came in five minutes later to reapply the cuffs. When Alton explained that he could not eat while handcuffed, he claims West became belligerent and insisted he had enough time to eat. West spoke to a nurse and had her take away Alton's food tray. West then re-applied cuffs, and denied Alton the opportunity to use the bathroom. Plaintiff asked to speak to a supervisor and complained to Major Robertson about the incident with West. Robertson explained that Smith had uncuffed Alton as a courtesy, but because Alton had argued with West, the courtesy would not be extended again.

Alton claims he asked Smith to be unshackled in order to use the toilet, but Smith would not do so until a nurse asked on Alton's behalf. After using the toilet, Alton was restrained again by West who allegedly laughed about it. Approximately one-half hour later, Alton again requested to use the toilet, but claims no one responded until after the shift change and by that time Alton had soiled his bedding and "part of a wheelchair."

Prior Administrative Proceedings

Alton filed administrative remedy procedure (ARP) complaints regarding his transportation to Bon Secours Hospital and being shackled while in the hospital. ECF No. 19 at Ex. 1 – 6. His claim that restraints applied to him while he was in the hospital violated the ADA and the Eighth Amendment (ARP JCI 0706-11) was heard by an Administrative Law Judge (ALJ) for the Inmate Grievance Office (IGO). *Id*. at Ex. 6, pp. 24 – 40.

With respect to his ARP regarding transportation (JCI ARP-0705-11) Alton asserted his transfer to the hospital was delayed on the morning of April 18, 2011, because Johnson and Smith refused to honor medical orders stating that his legs should not be shackled when he was using crutches. Alton claimed that Smith told him he would not be taking his crutches with him to the hospital and that Bell assured him medical staff would insure he would be safely moved from the bed to the toilet, chair, and/or operating table. Alton further alleged that Bell told him that if he did not use a wheelchair for purposes of the private transport to the hospital Alton would not receive medical care. Alton also claimed, as he does in the instant Complaint, that when he arrived at the hospital Smith and Johnson denied his request to use the toilet, forcing him to remain in soiled bedding for over three days, that he was restrained in a manner that precluded him from eating his meals, and that use of a bed pan as required was impossible for him due to his bursitis. ECF No. 19 at Ex. 2, p. 2.

Alton's ARP was investigated by Lt. Oliver who interviewed Alton and received reports from Smith and Johnson regarding Alton's hospital stay. ECF No. 19 at Ex. 2, p. 3. Smith reported that on April 18, 2011, he was assigned to escort Alton to Bon Secours Hospital, but could not properly transport him because the available van would not allow for Alton's proper restraint. *Id*. at p. 18. A Transcare Wheelchair Ambulance was used instead of the State van to address the special restraint needed for Alton's transportation. Once at the hospital Smith stated that Alton was restrained to a hospital bed on one arm and one leg as required by Division of Correction Directive (DCD) 110-42. Although Smith admitted that Alton requested a urinal, he denies any knowledge that Alton had soiled himself. Johnson's report mirrors Smith's report. *Id*. at Ex. 2, p. 19.

The relevant directive, DCD 110-42.VI.G.11 and L.1, provides that all hospitalized inmates must be restrained as if they were maximum security inmates and, unless medically prohibited, all inmates must be restrained to the hospital bed by one leg and one arm.  ECF No. 19 at Ex. 2, pp. 12 and 15.  Oliver's investigation determined that Smith and Johnson acted in accordance with the directives regarding restraints and further concluded that they were not responsible for cleaning inmates or soiled clothing or bedding.  Rather, Smith and Johnson's responsibility extended only to transporting Alton to his appointment at the hospital where he was then placed on a secure hospital ward.  Based on his investigation, Oliver recommended that the ARP be dismissed without merit and, on June 23, 2011, the Warden dismissed the ARP.  Alton appealed the dismissal of the ARP regarding transportation to the Commissioner of Correction and the appeal was dismissed due to Alton's failure to provide any additional evidence about the failure to abide by a long-standing medical order respecting restraints.  It was further noted that Alton was transported by wheelchair ambulance, obviating the need for crutches.  ECF No. 19 at Ex. 3, p. 1.

Alton's ARP regarding restraints during his hospital stay (ARP JCI 706-11) alleged he was shackled to the bed, denied adequate toileting facilities, and could not eat food served to him at meal times.  Captain Donovan investigated the ARP, interviewing Alton and reviewing Smith's Matter of Record as well as Post Order for Bon Secours Hospital.  In his matter of record, Smith stated he was the officer in charge of the Bon Secours Security Ward known as St. Joseph's on June 21, 2011.  Lunch trays arrived at approximately 11:30 a.m. and, as a courtesy, he uncuffed Alton during the meal.  Smith had previously consulted with medical staff to ensure there was no medical necessity for Alton to be uncuffed.  Approximately one-half hour later,

Smith directed Corporal West to resecure Alton to his bed, believing he had sufficient time to eat and Alton complained. ECF No. 19 at Ex. 4, pp. 1 – 5.

Inmates hospitalized at Bon Secours are secured to the bed by one leg iron around the ankle and one handcuff on the opposing wrist which are attached to the bed; thus, one hand remains free to eat meals. Smith reported that Alton's room contained a toilet and sink, along with a call button he could use to request assistance. When bathroom access is required, handcuffs and leg irons are removed from the bed and medical staff assists when necessary. Custody staff must remain in the area until the inmate is secured to the bed. To permit inmates to alternate positions, leg irons and handcuffs are allowed to be alternated to the opposite leg and wrist. *Id*. at Ex. 4, pp. 5 and 6. The post orders for Bon Secours Security Ward require inmates to be secured to the bed at all times. *Id* at pp. 8 and 13.

Donovan's investigation did not reveal any evidence of a medical order requiring Alton's restraints to be removed; therefore, he concluded that Alton was restrained in accordance with directives and post orders. Based on this information, the Warden dismissed Alton's ARP on June 23, 2011. *Id*. at p. 1. On July 25, 2011, Alton appealed the Warden's dismissal to the Commissioner of Correction. The appeal was dismissed on October 12, 2011, after the Commissioner concluded that correctional officers followed proper procedures in restraining Alton. ECF No. 19 at Ex. 5.

Alton appealed the Commissioner's finding to the Inmate Grievance Office (IGO) and a hearing was held before Administrative Law Judge (ALJ) Henry Abrams on February 12, 2012. Alton was represented at the hearing by another inmate, Bryant McArthur. Documents admitted jointly as exhibits included Alton's medical records and the post orders regarding restraint of inmates hospitalized at Bon Secours. In addition, Alton offered into evidence a February 2, 2011

medical order regarding his restraints. ECF No. 19 at Ex. 6, pp. 24 – 26.  After the hearing the ALJ issued a written decision which included a list of findings of fact.  The findings of fact relevant to the claims in the instant case follow.

On February 2, 2011, a note was written by a physician's assistant indicating that Alton was not to be front handcuffed or shackled while using crutches for six months from the date of the note.  ECF No. 19 at Ex. 6, p. 26.  On April 18, 2011, Alton was transferred to Bon Secours Hospital where he underwent a colonoscopy, a cholecystectomy (gall bladder removal), a hernia repair, and surgical implantation of four drains in his abdomen.  *Id*.  Alton remained in the secure ward of the hospital for six days following his surgery.  *Id*.  Immediately following the surgery and during his hospital stay, Alton was not allowed food or drink and thereafter was limited to a liquid diet with a gradual transition to regular food.  *Id*. at p. 27.  The ALJ further found that Alton was restrained to his bed in the secure ward by one handcuff around his wrist and one shackle on the opposite ankle, except when using the toilet in his room and on one other occasion.  *Id*.  On April 21, 2011, Sgt. Smith removed Alton's handcuff to allow him to eat his meal more easily and sent Corporal West to replace the handcuff "a while later."  *Id*.  When Alton was informed he would be re-cuffed, he complained and Smith informed him that he would no longer received the courtesy of being uncuffed for meals.  *Id*.  There were no medical orders issued requiring Alton to be uncuffed during his hospitalization.  Prior to his discharge, it was noted that Alton was stable and was eating a regular diet with an over-the-counter fiber supplement.  On April 25, 2011, Alton was discharged from the hospital to the infirmary in Jessup to continue recovery and was transferred to general population on May 6, 2011.  *Id*. at p. 28.

7

Based on those findings of fact, the ALJ found that Alton failed to sustain his burden of proof on any of his claims. ECF No. 19 at Ex. 6, p. 30. With respect to Alton's ADA claim, the ALJ observed:

> Even assuming that [Alton] was disabled and that he was denied adequate freedom of movement and/or toileting for which he was otherwise qualified as an inpatient, the record before me contains absolutely no evidence that the denials of which he complains were based on any such disability. In other words, [Alton] has not shown that he was treated in an objectionable way *because of a disability*, perceived or otherwise.

ECF No. 19 at Ex. 6, p. 30 (emphasis in original). The ALJ further found that the medical order prohibiting cuffing and shackling Alton while using crutches did not override the directives governing use of restraints while Alton was confined to a hospital bed because "[c]learly, he was not using crutches in his bed." *Id*. at p. 31. The transition summary written April 25, 2011, the day Alton was discharged from the hospital to the Jessup infirmary, also did not persuade the ALJ that the use of restraints during Alton's hospital stay was improper. The summary pertained to Alton's recuperation in the Jessup infirmary and provided for Alton to be allowed to walk around the hall; thus, it does not support Alton's assertion that he should have been permitted to use crutches during his hospital stay. The ALJ observed that the "Transfer Summary thus does not constitute a medical order preventing [Alton] from being cuffed and shackled to his bed under the relevant provisions." ECF No. 19 at Ex. 6, p. 32.

With respect to Alton's allegation that both of his hands were cuffed to the bed, making him unable to eat, the ALJ rejected his testimony based on the medical record. *Id*. The record, prepared by a physician and other hospital personnel, noted that Alton was tolerating food at the time of his discharge. The ALJ noted that the physician and other personnel had no apparent reason to misstate the facts regarding Alton's food intake and, if he had not been eating for any

8

reason, there would have been no reason to emphasize his ability to tolerate food or to note that Alton was "intestinally stable." ECF No. 19 at Ex. 6, p. 32.

With respect to Alton's claim regarding use of the toilet, the ALJ reviewed the relevant DCD which provides in part:

> 7. Communicate Inmate/Patients' Needs: Officers shall communicate to the nursing staff ALL inmate/patient requests pertaining to nursing care, i.e., . . . restroom privileges.
>
> \* \* \*
>
> 9. Inmate Restroom Usage
>    a.   When the inmate requests to use the restroom facilities:
>         (1)  The unarmed officer shall inspect the restroom for contraband and possible escape routes prior to usage by the inmate. Once satisfied, the officer shall allow the inmate to go to the restroom;
>         (2)  The unarmed officer shall unshackle the leg iron from the bed and reshackle to both legs;
>         (3)  The handcuff shall be uncuffed from the bed and recuffed to both wrists;
>         (4)  The restraints shall remain on the inmate at all times;
>         (5)  The unarmed officer shall escort the inmate/patient to the restroom without going in the restroom.
>    b.   While the inmate is using the facilities, the armed officer shall position himself/herself as far away from the inmate as possible, while maintaining direct observation.
> 10. Requesting Assistance: If assistance is required, officers shall notify the nurse on duty.

ECF No. 19 at Ex. 6, pp. 35 – 36, citing DCD 110-42.VI.G.7, 9 – 10. The ALJ concluded that Alton had not produced any evidence that the directives noted above were violated by any of the correctional staff and rejected Alton's claim that, due to his restraints, he was unable to access the toilet facility in his room throughout his stay, repeatedly soiled his bedding, and was forced to lie in his own waste. The ALJ noted that the evidence produced at the hearing supported that Alton was unable to make it to the toilet on only one occasion because the officer could not locate the key quickly enough, but there was no evidence the delay was intentional. *Id*. at p. 36. Because it was undisputed that medical staff responded appropriately when Alton's roommate's

colostomy bag burst, the ALJ found Alton's claim he was forced to lie in his own waste the entire time he was in the hospital without credibility. *Id*.

With respect to Alton's Eighth Amendment claim, the ALJ stated that Alton's "hardships in the hospital fall notably short of conditions that have been held not to violate the Eighth Amendment's prohibition against cruel and unusual punishments" because he had not shown any substantial risk of serious harm or an extreme deprivation resulting in denial of a minimal necessity of life. ECF No. 19 at Ex. 6, p. 38 (comparing *Rivera v. Pa. Dep't of Corr.*, 837 A. 2d 525 (Pa. Super. 2003) (holding that requiring inmates to eat meals within sight and smell of human waste, removal of water to drink except for every few hours, and chaining inmates to beds by all four limbs forcing them to soil themselves did not constitute cruel and unusual punishment)). The ALJ further noted that, "even if [Alton] had met the objective prong of the test set forth above, there is not a scintilla of evidence that DOC officials were subjectively aware of a serious risk of harm to [Alton] and deliberately ignored it." ECF No. 19 at Ex. 6, p. 39. The ALJ then concluded that Alton's claims were without merit. *Id*.

## Standard of Review

Summary Judgment is governed by Fed. R. Civ. P. 56(a) which provides that:

> The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion:

> By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.

*Anderson v. Liberty Lobby, Inc*., 477 U. S. 242, 247-48 (1986) (emphasis in original).

"The party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). The court should "view the evidence in the light most favorable to . . . the nonmovant, and draw all inferences in her favor without weighing the evidence or assessing the witness' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002). The court must, however, also abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993) and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).

**Analysis**

Eighth Amendment Claim

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. *Gregg v. Georgia*, 428 U.S. 153, 173 (1976). "Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment." *De'Lonta v. Angelone*, 330 F. 3d 630, 633 (4th Cir. 2003) (citing *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)). Conditions which "deprive inmates of the minimal civilized measure of life's necessities" may amount to cruel and unusual punishment. *Rhodes v. Chapman*, 452 U. S. 337, 347 (1981). However, conditions which are merely restrictive or even harsh, "are part of the penalty that criminal offenders pay for their offenses against society." *Id*.

> In order to establish the imposition of cruel and unusual punishment, a prisoner must prove two elements - that the

11

> deprivation of [a] basic human need was *objectively* sufficiently serious, and that *subjectively* the officials acted with a sufficiently culpable state of mind.

*Shakka v. Smith*, 71 F.3d 162, 166 (4th Cir. 1995) (emphasis in original) (internal quotations omitted). "These requirements spring from the text of the amendment itself; absent intentionality, a condition imposed on an inmate cannot properly be called 'punishment,' and absent severity, such punishment cannot be called 'cruel and unusual.' *Iko v. Shreve*, 535 F.3d 225, 238 (4th Cir. 2008) (citing *Wilson v. Seiter*, 501 U.S. 294, 298-300 (1991)).

To establish a sufficiently culpable state of mind, there must be evidence that a known excessive risk of harm to the inmate's health or safety was disregarded. *See Wilson*, 501 U. S. at 298. In other words, "the test is whether the guards know the plaintiff inmate faces a serious danger to his safety and they could avert the danger easily yet they fail to do so." *Brown v. N.C. Dept. of Corr.,* 612 F.3d 720, 723 (4th Cir. 2010) (quoting *Case v. Ahitow*, 301 F.3d 605, 607 (7th Cir.2002)). Conduct is not actionable under the Eighth Amendment unless it transgresses bright lines of clearly-established pre-existing law. *See Maciariello v. Sumner*, 973 F. 2d 295, 298 (4th Cir. 1992).

The objective prong of a conditions claim requires proof of an injury. "[T]o withstand summary judgment on an Eighth Amendment challenge to prison conditions a plaintiff must produce evidence of a serious or significant physical or emotional injury resulting from the challenged conditions." *Strickler v. Waters*, 989 F.2d 1375, 1381 (4th Cir.1993). "Only extreme deprivations are adequate to satisfy the objective component of an Eighth Amendment claim regarding conditions of confinement." *De'Lonta*, 330 F.3d at 634. Demonstration of an extreme deprivation proscribed by the Eighth Amendment requires proof of a serious or significant

physical or emotional injury resulting from the challenged conditions. *See Odom v. S.C. Dept. of Corr.*, 349 F. 3d 765, 770 (4th Cir. 2003).

Defendants' conduct is not actionable unless, "in light of preexisting law the unlawfulness of those actions is apparent." *Iko*, 535 F. 3d at 238 (4th Cir. 2008) (citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). "We do not require of such officials the legal knowledge culled by the collective hindsight of skilled lawyers and learned judges, but instead only the legal knowledge of an objectively reasonable official in similar circumstances at the time of the challenged conduct." *Johnson v. Caudill*, 475 F. 3d 645, 650 (4th Cir. 2007).

Alton claims he was deprived of food, water, adequate toilet facilities, adequate hygiene accommodations, and clean bedding. He further claims he was denied modification to restraints during transportation and during his hospital stay to accommodate toileting, bathing, eating, drinking, exercising, sitting upright, or "convalescing like a normal person." ECF No. 26 at p. 2. With regard to his transportation to the hospital, Alton claims he should have been permitted to keep his crutches with him during his hospital stay so that he could use public hospital toilet facilities, walk, and exercise. *Id*. at p. 3. He further states that any number of combinations of restraints and practices of restraining him in the van which were used in the past could have allowed for him to keep his crutches with him. *Id*. The regulations regarding hospitalization of inmates were, however, applied to Alton without exception. To the extent that the requests could have been accommodated and would have made Alton's hospital stay more comfortable, Defendants' decision not to grant his requests are not actionable. The Eighth Amendment does not require correctional officials to consider and weigh the reasonableness of an inmate's request. Rather, it is sufficient if correctional officers avoid imposition of cruel or inhumane treatment of inmates which are likely to cause serious injury. Defendants' decision to deny

Alton access to his crutches does not evidence a deliberate indifference to a risk of serious harm to him where Defendants reasonably believed his needs for toileting and hygiene would be met by hospital staff.  As such, Defendants are entitled to summary judgment in their favor on the claim regarding Alton's transportation to the hospital.

Alton's claim that he was not allowed to eat while hospitalized because of the restraints applied to his arm and leg also lacks merit.  Alton alleges one instance when he was not given enough time to finish eating his meal before restraints were re-applied.  He does not dispute that the regulation concerning restraints of inmates in the hospital requires securing one wrist and one ankle to the bed, but implies both of his wrists were secured to the bed.[1]  As observed by the ALJ, upon his discharge from the hospital it was noted Alton was tolerating a normal diet.  Thus, it appears that Alton was not deprived of food the entire time he was hospitalized as he implies.  One instance where Alton was not permitted to finish eating his meal is not enough to establish cruel and unusual punishment.

The remaining claims raised regarding clean bedding, toileting, exercise, and hygiene are all aspects of his hospital stay that were not within the power of Defendants, who are correctional personnel, to effect.  The staff members at the hospital were charged with Alton's care and, because they are not state actors, the Eighth Amendment does not apply to their actions.[2]

---

[1] Alton's claim that his ankle restraint was not moved from one leg to the other when he complained that the compression device was hurting his leg is also unavailing.  He admits the restraint was moved, but not immediately upon his request.

[2] The Court notes that there is no evidence to support Alton's assertion that he was left in soiled bedding the entire time he was hospitalized and that the unfortunate accident that occurred was not rectified by replacement of the bedding which was effected.

ADA Claim

In order to establish a claim under the ADA, a plaintiff must show that he is a person with a disability as defined by the statute; that he is otherwise qualified for the benefit he claims to have been denied; and that he was excluded from the benefit due to discrimination based on his disability. *See Doe v. Univ. of Md. Med. Sys. Corp.*, 50 F.3d 1261, 1265 (4th Cir. 1995); *see also* 42 U.S.C. § 12131 *et seq.* It is not enough to simply establish a disability exists and services were not provided.

Defendants assert that Alton's claims are barred by *res judicata* because they were litigated before the IGO and Alton was unsuccessful in establishing his claims had merit. The doctrine of *res judicata* precludes the assertion of a claim after a judgment on the merits in a prior suit by the same parties on the same cause of action. *See Meekins v. United Transp. Union*, 946 F. 2d 1054, 1057 (4th Cir. 1991). The operative cases relied upon by Defendants involved administrative agency decisions which were appealed and later affirmed by the state court. *See* ECF No. 19-1, p. 18 citing *Batts v. Lee*, 949 F. Supp. 1229 (D. Md. 1996). In *Batts*, this Court noted that "[f]ederal courts are required under the Full Faith and Credit Statute to accord state court judgments which affirm state administrative agency decisions the same issue and claim preclusive effect in subsequent 1983 actions as they would be entitled in the state which rendered the decision." *Id.* at 1232. In the instant case, there has been no such appellate review. It is, therefore, questionable whether the issues before this Court were "finally litigated" for purposes of *res judicata*. *Id.*, (quoting *Peugeot Motors of Am., Inc. v. E. Auto Distrib., Inc.*, 892 F. 2d 355, 359 (4th Cir. 1989).

Thus, this Court declines to find that the findings of the ALJ are *res judicata*. Nonetheless, the reasoning applied to Alton's ADA claim are unassailable. Alton has presented

no evidence that he was denied services *because* of his disability; rather, his claims regarding his treatment while in the hospital pertain to security measures applied to him because he is an inmate. In short, he was treated as any other inmate in his position would be treated. With regard to his transportation to the hospital, Alton's claim amounts to his disagreement with the manner in which he was transported. He is not entitled to dictate the specifics of how he is transported so long as it is done in a safe, responsible manner. In this case, a specialized vehicle was used to transport Alton via wheelchair to the hospital. He alleges no harm or violations of safety measures during the transport. Accordingly, Defendants are entitled to summary judgment in their favor on Alton's ADA claim.

    A separate Order will follow.


_March 19, 2013_                                                                                  /s/
    Date                                                           William M. Nickerson
                                                                      Senior United States District Judge